UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-80361-Civ-Ryskamp/Hopkins

ARTHUR J. GALLAGHER SERVICE
COMPANY and RISK PLACEMENT
SERVICES, INC.,

                          Plaintiffs,

vs.

THOMAS EGAN,

                          Defendant.
_____/

FILED by _____ D.C.

**JUN 2 9 2012**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## REPORT AND RECOMMENDATION AS TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (DE 7)

**THIS CAUSE** has come before this Court upon an Order Referring Plaintiffs' Motion for

a Preliminary Injunction to the undersigned United States Magistrate Judge for a hearing and a

Report and Recommendation. (DE 13). Defendant filed his response to the motion on May 1,

2012 (DE 16), and Plaintiffs filed their reply papers on May 10, 2012 (DE 19). Pursuant to the

District Court's Order, this Court held an evidentiary hearing on the motion on June 21, 2012.

On June 8, 2012, Defendant submitted a supplemental memorandum of law. (DE 44). For the

reasons that follow, this Court **RECOMMENDS** that the District Court **GRANT** Plaintiffs'

Motion for a Preliminary Injunction.

## BACKGROUND

Plaintiffs' Complaint alleges one count against Defendant Thomas Egan for Breach of

Restrictive Covenants under Fla. Stat. § 542.335. (DE 1). The allegations in the Complaint stem

from an employment contract ("the Executive Agreement"), which the parties entered into on

July 16, 2007, when Defendant began five years of employment as an Assistant Vice President

with Plaintiffs' insurance brokerage company, Risk Placement Services, Inc. ("RPS"). *Id.*

Defendant's principal duties involved the sales and servicing of Plaintiffs' accounts. (DE 7 at

page 3). The Executive Agreement sets forth certain restrictive covenants, the alleged violation

of which form the basis of Plaintiffs' motion for a preliminary injunction. The relevant portions

of the Executive Agreement are as follows:

> **Paragraph Thirteen**. The Executive recognizes the highly
> sensitive nature of the Confidential Information to which he will
> have access during his employment, and acknowledges the
> Company's legitimate interest in safeguarding same from
> disclosure. Accordingly, the Executive agrees that, for a period of
> two (2) years following the termination of his employment for any
> reason whatsoever, he will not divulge the Company's Confidential
> Information or make use of it for his own purpose or the purpose of
> another.

> **Paragraph Fourteen**. The Executive recognizes the Company's
> legitimate interest in protecting, for a reasonable period of time
> following the termination of the Executive's employment, those
> Company accounts with which the Executive will be associated
> during his employment. Accordingly, the Executive understands
> and agrees that for a period of two (2) years following the
> termination of his employment for any reason whatsoever, he will
> not (i) directly or indirectly, solicit, place, accept, aid, counsel or
> consult in the renewal, discontinuance or replacement of any
> insurance or reinsurance by, or handle self-insurance programs,
> insurance claims or other insurance administrative functions
> ("insurance services") for, any existing Company account or any
> actively solicited prospective account of the Company for which he
> performed any of the foregoing functions during the two-year
> period immediately preceding such termination or (ii) provide any
> employee benefit brokerage, consulting, or administration services,
> in the areas of group insurance, defined benefit and defined
> contribution pension plans, human resources and staffing services,
> individual life, disability and capital accumulation products, and all
> other employee benefit areas ("benefit services") the Company is
> involved with, for any existing Company account or any actively

> solicited prospective account of the Company for which he
> performed any of the foregoing functions during the two-year
> period immediately preceding such termination. The term
> Company account as used in this paragraph shall be construed as
> insured's written via Risk Placement Services, Inc.

*See* Executive Agreement, attached as Exhibit A to Declaration of Raul E. Plasencia (DE 7-1);

Plaintiffs' Exhibit 2.

Defendant's employment with Plaintiffs ended on March 6, 2012, when he resigned and

went to work for Plaintiffs' competitor, Genesee Special Brokerage. (DE 7 at ¶ 14). Plaintiffs

contend that Defendant took confidential information with him and immediately began soliciting

the business of their customers, in violation of the restrictive covenants set forth in the Executive

Agreement. (DE 1 at page 4). According to Plaintiffs, "several of those customers have

discontinued their business" with Plaintiffs and have moved their business to Defendant's new

company, causing Plaintiffs to suffer significant financial damage. *Id.* At the evidentiary

hearing, Raul Plasencia, a Senior Vice President with RPS, testified that Plaintiffs have suffered

over $164,000.00 in lost revenue to date, and anticipate additional lost revenues for years to

come because they have lost customers that had annually renewing accounts. *See also* Plasencia

Dec. (DE 7-1 at ¶ 21). Plaintiffs are also concerned that Defendant's conduct "is weakening the

Company's 'Elite Producer' status," and that Defendant will cause Plaintiffs to lose their

"highest tier" Diamond-level ranking, thereby reducing their commission revenue. *Id.* at ¶ 22.

Plaintiffs estimate this loss will range between $160,000.00 and $200,000.00 of additional

revenue per year. *Id.* Finally, Plaintiffs allege that their "financial losses are expected to increase

dramatically" if an injunction is not granted because Defendant "was responsible for

3

approximately $800,000.00 annually in business." *Id.* at ¶ 23.[1]

Based on the foregoing, Plaintiffs seek a preliminary injunction prohibiting Defendant,

his agents, servants, employees, and attorneys from:

> 1. Using, disclosing, disseminating or copying any documents or information Egan copied or took prior to his departure from the Company;
>
> 2. Either directly or indirectly soliciting, placing, accepting, aiding, counseling or consulting in the renewal, discontinuance or replacement of any insurance or reinsurance by, or handling self-insurance programs, insurance claims or insurance services for, any existing Company account or any actively solicited prospective Company account for which Egan performed any insurance-related functions during the two-year period immediately preceding the termination of his employment with the Company; and
>
> 3. Either directly or indirectly providing any employee benefit brokerage, consulting or administration services in the areas of group insurance, defined benefit and defined contribution pension plans, human resources and staffing services, individual life, disability, and capital accumulation products, and all other employee benefit areas the Company was involved with for any existing Company account or any actively solicited prospective Company account for which Egan performed any of the foregoing functions during the two-year period immediately preceding the termination of Egan's employment.

*See* Plaintiffs' Motion at page 2 (DE 7).

In his Answer to the Complaint, Defendant contends that when he resigned, the

employment agreement was no longer enforceable because Plaintiffs had already breached the

---

[1] Defendant states that when he joined Plaintiffs' company, he brought his existing business with him from his previous employer and became one of Plaintiff's "biggest producers." (DE 16 at page 5).

compensation provisions contained therein.[2]  Specifically, Defendant asserts that Plaintiffs were the first to breach the employment agreement by unilaterally reducing his compensation and, therefore, the restrictive covenants became null and void.  Defendant relies on the offer letter presented to him by Plaintiff RPS on May 1, 2007, which provides, in relevant part, as follows:

> Compensation Package:
>
> Salary:  $265,000 annual salary paid on the 15th and last day of the month.

(DE 16-1); Defendant's Exhibit 1.  The offer letter goes on to detail the "incentive formula" offered to Defendant, based on an attached bonus plan.  *Id.*  Notably, the offer states that it is subject to a "Signed copy of AJGCo. Code of Ethics" and the "Standard 90 Day Probationary Period."  (DE 16-1).  The offer letter makes no mention of it being contingent upon Defendant's execution of the Executive Agreement, which is the documents that contains the restrictive covenants.

According to Defendant, Plaintiffs "materially changed the terms of his employment without [his] agreement" by making a "unilateral change" that "resulted in a reduction of [his] annual salary from $265,000.00 to $201,500.00," and by instituting a change to his bonus structure.  (DE 16 at page 2). Based on this purported antecedent breach, Defendant argues that the employment agreement, including the restrictive covenants, became unenforceable.

Plaintiffs reject Defendant's claim, stating that "while it is true that a reduction in compensation *may*, under certain circumstances, constitute a material breach that excuses compliance with restrictive covenants, the recognized circumstances do not exist in this case."

---

[2]  Defendant's Answer includes a Counterclaim, alleging causes of action for breach of contract and unpaid wages.  (DE 14).

(DE 7 at page 13)(*emphasis in original*).  Relying on Paragraph Two of the Executive

Agreement, Plaintiffs assert that it "expressly gave the Company the unilateral right to modify

[Defendant's] compensation at its sole discretion."  (DE 7 at page 14).  Paragraph Two of the

Executive Agreement states as follows:

> The Company agrees that the Executive shall be entitled to the
> semi-monthly payment of compensation and, to the extent
> provided for in accordance with Company policy, the following: an
> annual paid vacation, and various employee benefit plans. It is
> understood and agreed that the Company may from time to time
> modify the specific terms and conditions of these entitlements.

*See* Executive Agreement (DE 7-2).

At the evidentiary hearing, Defendant testified that at a meeting in May 2009, John Head,

who currently serves as President for RSP, verbally promised Defendant that Plaintiffs would

never reduce his salary of $265,000.00.  After Defendant testified, Plaintiffs' counsel recalled

Mr. Head to the witness stand, and he emphatically denied ever making such a promise.

Defendant also contends that Plaintiffs do not have a legitimate business interest in

clients and accounts that were part of his "book of business" before he began working for RPS.

Defendant contends that Plaintiffs are improperly trying to prevent him from maintaining

relationships with clients that predate his employment with Plaintiffs.[3]

_____

[3] In his affidavit, Defendant states that "[i]n the 15 years prior to commencing work with RPS, I developed, cultivated, and nurtured business relationships with insurance agents and carriers, specializing in homeowners associations, condominium associations and commercial property.  These relationships were developed using my personal, social and business skills developed over a lengthy career in sales in the insurance industry . . . By 2007, I had a mature book of business generating approximately $600,000.00 of annual revenues.  RPS had no involvement, input or interest in the business and business relationships I developed over 15 years . . . At no time during my employment with RPS was I introduced to customers, clients or business contacts of RPS nor was I provided existing accounts and relationships to service or develop further. "  *See* Defendant's Aff. at ¶ 7-8, 21 (DE 16-1).

6

Plaintiffs dispute this claim, stating that

> a large part of [Defendant's] current book of business was developed only *after* he became employed with the Company, and was developed with the support and financial assistance of the Company. In addition, the evidence will show that a large part of the pre-existing business that [Defendant] brought to the Company was actually purchased by the Company from [Defendant's] prior employer.

(DE 19 at page 8)(*emphasis in original*). Indeed, at the evidentiary hearing, John Head testified that because Defendant also had a non-solicitation agreement with his previous employer, Plaintiffs purchased the book of business that Defendant had developed while working there and paid his previous employer $140,000.00 to release Defendant from that non-solicitation agreement. *See* Plaintiffs' Exhibit 16.

## DISCUSSION

As the party seeking injunctive relief, Plaintiffs bear the burden of establishing four elements: (1) that they have a substantial likelihood of success on the merits; (2) that they will be irreparably harmed if injunctive relief is denied; (3) that the threatened injury outweighs whatever damage the injunction may cause; and, (4) that the injunction, if issued, will not be adverse to the public interest. *See Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002) (*citing Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001)); *CBS Broadcasting Inc. v. EchoStar Commun. Corp.*, 265 F.3d 1193, 1200 (11th Cir. 2001) (*citing Siegel v. LePore*, 234 F.3d 1163, 1175 (11th Cir. 2000) (*en banc*)). It is well established that "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to all four elements." *Siegel*, 234 F.3d at 1176. Generally, the first element is the most important because granting a temporary restraining order

or motion for preliminary injunction would be inequitable if the movant has no chance of success on the merits. *See Butler v. Alabama Judicial Inquiry Comm'n*, 111 F. Supp 2d 1224, 1229-1230 (M.D. Fla. 2000). "If the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002) (*citing Pittman v. Cole*, 267 F.3d 1269 (11th Cir. 2001).

"The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001). A court may only issue a preliminary injunction if the movant gives security that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined. Fed. R. Civ. P. 65(c).

This is a diversity case and although the parties do not dispute that Florida law will ultimately apply to the merits of the substantive issues, the Eleventh Circuit has held that the courts looks to federal law in determining whether to grant or deny a preliminary injunction. *Ferrerro v. Assoc. Materials, Inc.*, 923 F.2d 1441, 1448 (11th Cir.1991).

## 1. Substantial Likelihood of Success on the Merits

The first element is satisfied if "good reasons for anticipating [success] are demonstrated." *Southern Wine and Spirits of America, Inc. v. Simpkins*, 2011 WL 124631, *2 (S.D. Fla. Jan. 14, 2011). Merely advancing a colorable claim is insufficient. *Id.* (*citing City of Jacksonville v. Naegele Outdoor Adver. Co.*, 634 So.2d 750, 753 (Fla. Dist. Ct. App.1994)). As discussed below, to achieve success on their claim, Plaintiffs must show that the restrictive covenants contained in the Executive Agreement were reasonable and that Defendant's actions

constituted a breach of those covenants.

## A. Reasonableness of the Restrictive Covenants

Section 542.335 of the Florida Statutes governs the validity of restrictive covenants entered into after 1996. Fla. Stat. § 542.335; *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1231 (11th Cir. 2009). Florida law permits the enforcement of contracts restricting or prohibiting competition as long as such contracts are reasonable in time, geographic area, and line of business. Fla. Stat. § 542.335(1). Restrictive covenants must be set forth in a writing signed by the person against whom enforcement is sought. Fla. Stat. § 542.335(1)(a). The movant must prove that the restrictive covenant is reasonably necessary to protect one or more legitimate business interests. Fla. Stat. § 542.335(1)(b) and (c). The term "legitimate business interest" includes, but is not limited to: valuable confidential business information, substantial relationships with prospective or existing customers or clients, and extraordinary or specialized training. *Id.*

Once the movant establishes its *prima facie* case, the party opposing enforcement of the restrictive covenant then has the burden of establishing that the restraint is overbroad, overlong or otherwise not reasonably necessary to protect the established legitimate business interests. Fla. Stat. § 542.335(1)(c). In Florida, a presumption exists that any restrictive covenant for six months or less is reasonable and for more than two years is unreasonable as to a former employee, agent or independent contractor. Fla. Stat. § 542.335(1)(d). In determining the reasonableness of a restrictive covenant, courts employ a balancing test to weigh the employer's interest in preventing competition against the oppressive effect on the employee. *See Medi-Weightloss Franchising USA, LLC v. Medi-Wieghtloss Clinic of Boca Raton, LLC*, 2012

9

WL 260902, *4 (M.D. Fla. Jan. 3, 2012)(*citing Miller Mechanical, Inc. v. Ruth*, 300 So.2d 11, 12 (Fla. 1974)).

Given that the restrictive covenants at issue here are for a two year period following the end of Defendant's employment with Plaintiffs, the Court finds them to be facially reasonable. *See Tomasello, Inc. v. de Los Santos*, 394 So.2d 1069, 1072 (Fla. Dist. Ct. App. 1981) (finding an agreement not to compete for a period of two years following termination of employment facially reasonable). The restrictive covenants are silent as to geographic scope, but such is not fatal to the reasonableness the non-solicitation provisions at issue here. *See Mohr v. Bank of New York Mellon Corp.*, 393 Fed. Appx. 639, 645 (11th Cir. 2010)(where employees agreed they would not solicit their employer's customers, court found "no need for a territorial restriction expressed in geographic terms")(*citations omitted*).

The covenants are also reasonable because the line of business is limited to the insurance industry and because the non-solicitation provisions do not prevent Defendant from continuing to do business with the retail insurance agents he has worked with for years; rather, Defendant is only precluded from soliciting business from the underlying clients for whom RPS has provided insurance policies.

Plaintiffs have also demonstrated that the restrictive covenants seek to protect their legitimate business interests. First, Plaintiffs seek to protect their customer base by prohibiting Defendant from soliciting their customers. Second, Plaintiffs seek to protect their confidential business information which they allege Defendant "surreptitiously" copied immediately prior to announcing his resignation. (DE 7 at page 12). Plaintiffs seek to enjoin Defendant from using or disseminating whatever information he took.

10

Defendant's attempt to rebut the facial validity of the restrictive covenants, claiming that they are not reasonable because Plaintiffs lack a legally cognizable legitimate business interest in the business contacts and relationships Defendant possessed prior to his employment with Plaintiffs, is unavailing. (DE 16 at page 12). As Plaintiffs established at the hearing, they paid $140,000.00 to Defendant's prior employer to release him from that non-solicitation covenant. Thus, Plaintiffs essentially purchased Defendant's book of business and, therefore, they have established a legitimate business interest in those accounts.

The applicability of a non-solicitation provision to pre-existing clients was addressed in *Moore v. Howard*, 534 So.2d 935 (Fla. Dist. Ct. App. 1988). There, the court distinguished between "two separate classes of business customers," namely, those with whom the employee had established a relationship prior to executing the employment contract, and those whom he initiated contact with during the course of his employment. *Id.* at 936. The court interpreted the language of the employment agreement and found that "the parties intended to exclude preexisting clients" from the non-solicitation provision. *Id.*

However, in *Mohr v. Bank of New York Mellon Corp.*, 393 Fed. Appx. 639 (11th Cir. 2010), where the plaintiff-employer had purchased the customers and "goodwill" of the employee's prior employer, the Court found that the plaintiff-employer was entitled to require employees to sign an agreement that they would not solicit the former and prospective customers, and that this was a reasonable way to protect its interest. *Id.* at 645 (*citing Hicks v. Doors By Mike, Inc.*, 260 Ga. App. 407, 411 (Ga. App. 2003)(where employer purchased the benefit of its new employee's customer base, non-compete and non-solicitation agreements are "essential to protect the value of the business . . . purchased as well as the good will of its customer base")).

11

Similarly, here, Plaintiffs' purchase of Defendant's book of business transformed his pre-existing client base into a legitimate business interest of Plaintiffs.

Based on the foregoing, the Court finds it is likely that Plaintiffs will succeed in establishing that the restrictive covenants at issue here are reasonable.

### B. Plaintiffs' Likelihood of Success on Breach of Contract Claim

To succeed on a breach of contract claim in Florida, a plaintiff must establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach. *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009)(applying Florida law). Thus, for Plaintiffs to succeed in obtaining a preliminary injunction, they must show that it is likely that they will ultimately prevail on their breach of contract claim by establishing these three elements.

Here, it is undisputed that Defendant breached the restrictive covenants in his employment agreement by soliciting business from Plaintiffs' clients, and therefore, the Court finds it likely that Plaintiffs will prevail on their breach of contract claim. The primary issue for this Court to determine is whether Defendant will succeed on his counterclaim, which alleges that Plaintiffs' antecedent breach of the compensation provision nullified the employment agreement, including the restrictive covenants.

Plaintiffs deny that they committed an antecedent breach, claiming that "even though the Company may have reduced Egan's compensation, it did not breach its Agreement with him by doing so because the Company had the unfettered right to do so under the terms of the Agreement." (DE 7 at page 14). Plaintiffs argue that RPS's offer of employment merely set forth Defendant's "*starting* salary," which was "not 'fixed' or otherwise guaranteed." (DE 19 at

page 2)(*emphasis in original*).

The crux of the parties' dispute involves determining the documents that form the agreement that governs the terms of their relationship. It appears that Plaintiffs rely solely on the "Executive Agreement" (Plaintiffs' Ex. 2) as the controlling document; whereas Defendant relies on the parties' executed "offer and acceptance" as the governing contract (Defendant's Ex. 1), arguing that the Executive Agreement should be interpreted in conjunction with the offer.

According to Defendant,

> [t]he written offer and acceptance and Arthur J. Gallagher & Co.'s form employment agreement were dated the same day and dealt with the same subject matter: Egan's employment. The documents should be regarded as one contract and interpreted together, as the inescapable conclusion is that the Plaintiffs and Egan were operating under one direct contract.

(DE 16 at page 6).

Plaintiffs, on the other hand, characterize their offer letter as "merely an outline of an offer of employment," which "did not cover all material terms of the employment relationship." (DE 19 at page 2). Morever, Plaintiffs contend that the offer was made to Defendant in May 2007 and was, therefore, superseded by the Executive Agreement. *Id.*; *see also* Executive Agreement at ¶ 21.

This argument is unpersuasive. The offer containing Defendant's compensation package cannot be construed as a previous and, therefore, superseded agreement because it was executed by Defendant on July 16, 2007, the same day he signed the Executive Agreement. Accordingly, the Court concludes that the two documents must be read together to discern the parties' intent. *See Vereen v. Lou Sobh Automotive of Jax, Inc.*, 2012 WL 601217, *10 (M.D. Fla. Feb. 23,

2012)("Florida law permits multiple documents regarding the same subject matter or transaction executed at or near the same time to be construed together as a single contract"); *Quix Snaxx, Inc. v. Sorensen*, 710 So.2d 152, 153 (Fla. Dist. Ct. App.1998)("Documents executed by the same parties, on or near the same time, and concerning the same transaction or subject matter are generally construed together as a single contract.").[4]

Once the offer and Executive Agreement are read together, it seems unlikely that Defendant would prevail on his argument that Plaintiffs' unilateral modification of Defendant's compensation in February 2012 constituted an antecedent breach, thereby relieving him from the terms of the restrictive covenants. It is well settled in Florida that if an employer wrongfully refuses to pay the employee his compensation, then the employee is relieved of any further obligation under the non-compete contract and the employer cannot obtain an injunction. *See Benemerito & Flories, M.D., P.A. v. Roche*, 751 So.2d 91, 93 (Fla. Dist. Ct. App. 1999). However, here, there is no credible evidence to show that Defendant was guaranteed to receive

---

[4] Although the documents were signed by representatives from two different entities, Plaintiffs have proffered evidence establishing that they are closely affiliated corporate entities, and thus, this "does not prevent the agreements from being construed together." *Direct Mail Holding, LLC v. Bush,* 2012 WL 1344823, *5, n.9 (M.D. Fla. March 8, 2012). *See* Declaration of Raul E. Plasencia. (DE 17-1). Thus, the Court will construe the Executive Agreement and the offer letter as being entered into by Plaintiffs as a single entity.

Defendant's reliance on *Cellco Partnership v. Kimbler*, 68 So.3d 914 (Fla. Dist. Ct. App. 2011) to show that the Executive Agreement is unenforceable by RPS, is misplaced. (DE 44). As in *Cellco*, the Executive Agreement here specifically states that it is entered into by the employer parent company, its subsidiaries, divisions and affiliated and related companies. *See* Plaintiffs' Exhibit 2. Here, RPS was a named subsidiary of Arthur J. Gallagher & Co. at the time the Executive Agreement was signed, and therefore, it is a party to the contract. In *Cellco*, however, the corporate entity seeking to enforce the restrictive covenants was not affiliated with the defendant's employer at the time they entered into the employment agreement; therefore, the court found that it could not enforce the restrictive covenants. This critical difference renders *Cellco* inapplicable here.

the compensation set forth in the employment offer for the duration of his employment. Rather, Paragraph Two in the Executive Agreement indicates that Plaintiffs were entitled to modify his compensation at their discretion.[5]

To the extent Defendant testified at the evidentiary hearing that in May 2009, Mr. Head verbally promised him that his salary would never be reduced, his testimony does not alter the Court's conclusion. First, the Court found Defendant's testimony to be self-serving and less than credible, given that the evidentiary hearing was the first time Defendant ever alleged that his salary had been verbally guaranteed. Defendant's failure to raise such a significant fact in either his resignation letter (Defendant's Ex. 4), his Answer (DE 14), or his Affidavit (DE 16-1), undermines the veracity that such a promise was ever made, especially in light of Mr. Head's outright denial of it. In any event, even if the Court did credit Defendant's testimony that he received a verbal guarantee from Plaintiffs that his salary would not be reduced, he has not properly pled an oral modification of his written employment contract. *See Regions Bank v. Old Jupiter, LLC*, 2010 WL 5148467, *4 (S.D. Fla. Dec. 13, 2010)(court declined to consider belated claim of oral modification to a written contract where defendants failed to "properly assert[] a subsequent oral modification of contract as an affirmative defense in their pleadings").

As for the written terms of the employment contract, the Court has considered the two opposing cases primarily relied upon by the parties and finds that neither is sufficiently similar to the facts present here to govern the outcome of this motion. Both contain significant factual

---

[5] Notably, when the two documents are read together as forming a single agreement, the restrictive covenants do not require separate consideration to be enforceable. Indeed, "a single consideration is sufficient to support multiple promises bargained for in an agreement." *Alanies v. O'Quinn, Kerensky, McAninch & Laminack*, 140 F.3d 1037 (5th Cir. 1998).

differences to the instant case so as to render them distinguishable.

Plaintiffs rely on *Kupscznk v. Blasters, Inc.*, 647 So.2d 888 (Fla. Dist. Ct. App. 1994) for the proposition that "an at-will employee cannot claim a contract breach based on his employer's reduction of his compensation in the absence of an agreement that the compensation may not be reduced." (DE 19 at page 3). However, a major distinction is that in *Kupscznk*, the employment agreement, including the employee's base salary and commission structure, was never reduced to writing. *Kupscznk*, 647 So.2d at 889. Since there was never any written indication that the employee's salary was promised for any length of time, the court found that the employer was free to modify the employee's compensation without implicating the non-compete covenant (which was in writing). The court concluded that "the course of dealings by the parties indicates that there was never any intent that the commission structure could not be modified." *Id.*

Defendant relies on *Direct Mail Holding, LLC v. Bush,* 2012 WL 1344823, *5, n.9 (M.D. Fla. March 8, 2012), which is also distinguishable from the facts in this case. There, the employee signed a commission agreement on the same day she executed a non-competition agreement. The commission agreement, which guaranteed the employee a specific compensation, stated that it was to remain in effect for the same duration as the non-compete agreement. *Id.* at *5. Notably, the non-compete agreement included a boilerplate provision that nothing in the contract should be construed as guaranteeing a certain compensation. During the course of her employment, the employee's compensation was reduced for a period of time. Thereafter, the employee left the company, which then attempted to enforce the non-compete agreement, but the court found that the reduction in the employee's compensation constituted an antecedent breach that nullified the non-compete agreement. The court resolved the conflicting

provisions regarding the employee's pay in favor of the provision in the commission agreement that guaranteed the employee a certain compensation. The court stated, "it is axiomatic that the specific provisions of an agreement are to take precedence over the general provisions of the agreement if a conflict between such provisions is deemed to exist." *Direct Mail Holding*, 2012 WL 1344823, *6, n.12 (*citations omitted*).

Here, unlike *Direct Mail Holding*, Defendant's employment offer did not guarantee an annual salary of $265,000.00 for the duration of his employment or for any set period of time. Defendant, focusing solely on the offer letter, contends that it "did not allow Plaintiffs to vary the compensation package at its discretion." (DE 16 at page 4). However, neither does the employment offer explicitly guarantee that Defendant's salary and commission structure for any duration of time. In the absence of a provision guaranteeing Defendant's compensation for a period of time, this Court finds that Paragraph Two of the Executive Agreement, which states that Defendant's compensation may be modified, controls. Because there is no provision guaranteeing Defendant's compensation, the absence of a conflicting provision results in the conclusion that the provision in the Executive Agreement, although clearly a boilerplate provision, must govern, and Defendant will likely not prevail on his defense of an antecedent breach.[6]

---

[6] As an aside, the Court rejects Plaintiffs' argument that, in any event, their modification of Defendant's compensation was not significant enough to constitute a "material breach" of the employment agreement. (DE 7 at p. 15, n. 6). *See Direct Mail Holding, LLC v. Bush,* 2012 WL 1344823, *6 (M.D. Fla. March 8, 2012)("the material breach of an employment contract does not rest upon the value of the amount underpaid; it rests squarely on whether the full amount due was withheld wrongfully")(*citation and quotations omitted*). Moreover, to the extent Plaintiffs rely on Defendant's status as an at-will employee (because the agreement did not specify the duration of his employment), this has no bearing on Plaintiffs' right to modify the terms of Defendant's compensation and bonus package. *See J.R.D. Management Corp. v. Dulin*, 883 So.2d 314, 317

## 2. Threat of Irreparable Harm

The Supreme Court has stated that this element hinges on the irreparableness of the harm. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). *See also MacGinnitie v. Hobbs Group, LLC*, 420 F.3d 1234, 1242 (11th Cir. 2005)(the movant must demonstrate that it will suffer a harm which "cannot be undone through monetary remedies," for example, "in the form of lost opportunities, which are difficult, if not impossible, to quantify"). The harm alleged "must be actual and imminent rather than remote or speculative." *Medi-Weightloss Franchising USA, LLC v. Medi-Wieghtloss Clinic of Boca*, 2012 WL 260902, *8 (M.D. Fla. Jan. 3, 2012).

In their motion, Plaintiffs argue that the standard for showing irreparable harm under Fla. Stat. § 542.335(1)(j) should apply in this case based on the Florida choice of law provision in the employment agreement. (DE 7 at page 15). Under Florida law, the "violation of an enforceable restrictive covenant creates a presumption of irreparable injury," and the non-moving party bears the burden of rebutting that presumption. Fla. Stat. § 542.335(1)(j) (2010). However, under federal law there is no presumption of irreparable harm and, thus, the movant bears the burden of showing that the harm is "actual and imminent rather than remote or speculative." *Southern Wine*

---

(Fla. Dist. Ct. App. 2004)("only an action for breach of employment [] is barred when the contract of employment is terminable at will; other contractual provisions may not be affected by the at-will employment rule").

*and Spirits of America, Inc. v. Simpkins*, 2011 WL 124631, *8 (S.D. Fla. Jan. 14, 2011)(*citing Church of City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994).

It is well settled that a federal court's authority to issue a preliminary injunction is derived from Federal Rule of Civil Procedure 65, and thus, in a diversity action, the court must apply federal procedural law. *See Budget Rent A Car Corp. v. Harvey Kidd Automotive*, 249 F. Supp. 2d 1048, 1049-50 (N.D. Ill. 2003)(employer, seeking preliminary injunction, argued that court should apply Illinois law, which presumes irreparable injury once a protectable interest is established; the court noted that "[w]hile Illinois law is relevant to determining the likelihood of [] success on the merits (as this is a diversity case whose substantive issues are governed by Illinois law), '[t]he propriety of a preliminary injunction, of course, is to be determined by the rules and decisions of federal courts . . .' [therefore,] irreparable harm is not governed by Illinois law and its presumptions, but rather by federal law")(*quoting Gen. Elec. Co. v. Am. Wholesale Co.*, 235 F.2d 606, 608 (7th Cir. 1956)). *See also Ferrerro v. Assoc. Materials, Inc.*, 923 F.2d 1441, 1448 (11th Cir.1991)(although Georgia law presumes that injunctions are appropriate remedies and that they should issue except in limited cases, the Eleventh Circuit concluded that federal law applies and, thus, moving party must satisfy burden of persuasion as to all four elements); *Southern Wine and Spirits*, 2011 WL 124631 at *8.

Accordingly, the Court finds that even though the parties included a choice of law provision in the Executive Agreement whereby Florida law applies, such does not govern the considerations of whether a preliminary injunction will issue. *See Seda Specialty Packing Corp. v. American Safety Closure Corp.*, 1995 WL 404821, *2 (S.D.N.Y. 1995)(even though the parties specified New York in their choice of law provision, court found that federal law

controlled outcome of motion for preliminary injunction). Florida law is only relevant to the Court's analysis of the likelihood that Plaintiffs will succeed on the merits. *See Budget Rent A Car Corp.*, 249 F. Supp. 2d at 1049-50. Accordingly, no presumption should be applied to the irreparable harm element, and Plaintiffs must satisfy the burden of proof for this factor under the federal standard. *Id.*[7]

Here, even under the heightened federal standard, Plaintiffs have established that they will be irreparably harmed in a way that is "not readily calculable" if a preliminary injunction does not issue. Indeed, it is undisputed that since leaving RPS, Defendant has actively solicited Plaintiffs' clients.[8] As Plaintiffs suggest, the ongoing nature of Defendant's violation, would undoubtedly destroy the goodwill Plaintiffs have established with their customers. The Eleventh Circuit has held that when employees entice their former employer's customers to transfer their business, "the loss of customers and goodwill is an irreparable injury" that warrants a preliminary injunction. *Mohr*, 393 Fed. Appx. at 646 (*quoting BellSouth Telecomms,. Inc. v. MCIMetro Access Transmission Servs., LLC,* 425 F.3d 964, 970 (11th Cir. 2005)).

---

[7] "Although the right upon which this cause of action is based is state-created, Rule 65(a) of the Federal Rules of Civil Procedure contemplates a federal standard as governing requests addressed to federal courts for preliminary injunctions." *System Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1141 (3d Cir. 1977). The rationale is that a preliminary injunction "affords only temporary relief, [thus] there is no danger that the issuance of a preliminary injunction in a federal case such as this, involving only state law claims, will seriously interfere with the goals or policies associated with the state-created right at issue, and which will ultimately be adjudicated in accordance with state substantive law." *Boston Laser, Inc. v. Qinxin Zu*, 2007 WL 2973663, *5 (N.D.N.Y. Sept. 21, 2007)(*citing* 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2943 (2d ed. 1995)).

[8] In addition to the testimony adduced at the hearing, Plaintiffs introduced several exhibits demonstrating Defendant's efforts to have Plaintiffs' clients execute authorizations changing their Broker of Record (BOR) to Defendant. *See* Plaintiffs' Exhibits 10, 11, 13, and 14.

Based on the irreparable harm Plaintiffs are and will continue to suffer if Defendant is not immediately enjoined from soliciting their customers, this Court finds that this element weighs in favor of granting a preliminary injunction.

### 3. Balancing the Harm

Although Defendant alleges that a preliminary injunction would prevent him from earning a living because "there are so few agencies" that specialize in insuring condominiums and homeowners' associations (*see* Defendant's Aff. at ¶ 40), the Court rejects this argument. As noted during the evidentiary hearing, the non-solicitation clause in the Executive Agreement does not prevent Defendant from using his longstanding contacts with retail insurance agents to generate business on new accounts. The non-solicitation clause only prohibits Defendant from soliciting business from Plaintiffs' accounts. Since an injunction would not preclude Defendant from continuing to engage in his profession, the Court finds there is minimal, if any, harm to him. On the other hand, if an injunction is not entered, Plaintiffs stand to lose: (1) longstanding accounts in which they have invested significant resources, (2) revenues from the renewals of those accounts, and (3) their clients' goodwill. Thus, the balancing of harm weighs in favor of granting the preliminary injunction.

### 4. Public's Interest

Finally, the public's interest also weighs in favor of a preliminary injunction since it is against public policy to allow established violations of contractual agreements, including restrictive covenant provisions, to continue unabated. Indeed, the law has an "interest in upholding and protecting freedom to contract and to enforce contractual rights and obligations," especially when the former employee "specifically negotiated" and agreed to the restrictive

covenants. *Mohr*, 393 Fed. Appx. at 646. *See also Hilb Rogal & Hobbs of Florida, Inc. v. Grimmel,* 48 So.3d 957, 962 (Fla. Dist. Ct. App. 2010)("the public has a cognizable interest in the protection and enforcement of contractual rights . . . [t]his interest is particularly strong with respect to non-compete agreements, as the Florida Legislature has determined that the enforcement of such agreements is in the public's best interest")(*citation omitted*).

## RECOMMENDATION TO THE DISTRICT COURT

Based on the foregoing, **IT IS HEREBY RECOMMENDED** that the District Court **GRANT** Plaintiffs' Motion for a Preliminary Injunction. (DE 7).

## NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Kenneth L. Ryskamp, Senior United States District Court Judge for the Southern District of Florida, within fourteen (14) days of being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1) (2009) (providing that "within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court.") *See also* Fed. R. Civ. P. 72(b) (2009) ("Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy.") Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein. *See LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988), *cert. denied*, 488 U.S.

958 (1988); *RTC v. Hallmark Builders, Inc*, 996 F.2d 1144, 1149 (11th Cir. 1993).

 **DONE and SUBMITTED** in Chambers this 29 day of June, 2012, at West Palm Beach

in the Southern District of Florida.

*James M. Hopkins*

_____
JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE


Copies to:
The Hon. Kenneth L. Ryskamp, Senior United States District Court Judge for the Southern
District of Florida
Counsel of Record